## JOHN J. McLAREN *v.* THE MAYOR, ALDERMEN AND COMMONALTY OF NEW YORK.

The City Inspector of the city of New York, being authorized by a resolution of the Board of Health to employ the plaintiff's assignor " to remove temporarily, or until further ordered by the Board or the Common Council, all the contents of the sinks and privies of the city beyond the harbor," made a contract accordingly, fixing the rate of compensation, as directed by the resolution, at fifty dollars per week for the first six months, and forty dollars per week for the time after that period.

*Held*, That such contract was within the power conferred on the Board of Health by section 6 of the act of. 1850, ch. 275, title 3, and section 27 of the act of 1857, ch. 446; and the Corporation was chargeable with the expenses arising from the employment of the plaintiff's assignor.

*Held further*, That it being competent, by the terms of the contract, for the defendants or the Board of Health to terminate it at any moment, it could not be deemed a continuing contract, or as invading the powers of the Common Council as prescribed by the charter, to make contracts for the same work.

McLaren v. Mayor,&c. of New York.

*Held further*, That such contract was not in violation of section 38 of the charter of 1857, requiring all contracts involving an expenditure of over $250 to be founded upon sealed bids and proposals.

*It seems*, That the provisions of section 38 of the charter of 1857 apply only to contracts to be let by authority of the Common Council, and were never intended to apply to the Board of Health.

The Courts have no power, in collateral proceedings, to inquire whether the facts upon which a Board of Health determines a thing to be a nuisance justify its conclusion.

Appeal by the plaintiff from a judgment entered on the report of a referee at Special Term.

The action was brought by the plaintiff as the assignee of one Woodruff, to recover the sum of $3,360.80 from the Corporation for work and services in removing beyond the harbor the contents of the sinks and privies of the city. The contract under which the services were rendered was made with Woodruff by the City Inspector, under the authority of a resolution of the Board of Health. The agreement thus entered into was as follows :—" Agreement made this 12th day of June, in the year one thousand eight hundred and fifty-eight, between Wm. H. Woodruff, of Newark, in the State of New Jersey, of the first part, and George W. Morton, city inspector of the city of New York, of the second part: Whereas, by a resolution adopted by the Board of Health of the city of New York, at a meeting held by them at said city, on the 11th day of June, in the year 1858, it was *Resolved*, 'That the city inspector be empowered to employ Wm. H. Woodruff to remove temporarily, or until further ordered by this Board or the Common Council, all the contents of the sinks and privies of this city beyond the harbor, without nuisance, provided the rates of compensation, including all expenses, shall not exceed the sum of fifty dollars per week for boats of fifty tons burthen, and in the same ratio for boats of larger proportions, and that the city inspector be directed to order the work of removing the night soil to be commenced to-morrow evening.'

" Now, therefore, this agreement witnesseth, that, in conformity with the above resolution, the said William H. Woodruff has agreed with the said party of the second part as follows :

" That he, the said William H. Woodruff, will, as long as the

McLaren v. Mayor &c. of New York.

city inspector shall, under said resolution, employ him to do the work aforesaid, do and perform the same as is provided for and upon the terms stated in said resolution, and in case he shall be employed to do such work for the space of six months from and including the date hereof, the price to be paid to him therefor shall be only forty dollars for boats of fifty tons burthen, and in the same ratio for boats of larger proportion, instead of fifty dollars as is provided in said resolution.

"And the said party of the second part hereby, on behalf of the city of New York, and in pursuance of said resolution, agrees with the said Woodruff as follows :—That for the services herein on the part of said Woodruff, agreed to be done and performed, he, the said Woodruff, shall be entitled to receive as a compensation the price or rate stated in said resolution, provided, however, that if he, the said Woodruff, shall be employed as aforesaid for the term of six months, he shall be entitled to receive from the said city of New York only the sum of forty dollars per week, as is hereinbefore in the agreement on the part of said Woodruff contained.

(Signed)          " W. H. Woodruff.

" City Inspector's Department.

"This will certify, that so far (and by virtue of authority of the Board of Health) as the foregoing resolution may empower me so to do, that I have employed Mr. Wm. H. Woodruff to furnish vessels to receive and remove night soil from the city on the terms above set forth.

(Signed)          " Geo. W. Morton,

" City Inspector."

The work was performed by Woodruff, and the bills therefor were examined and respectively approved by the city inspector.

The case was referred to Hamilton W. Robinson, Esq. as sole referee to hear and determine. He found as a conclusion of law that " the said Board of Health had no power or authority to authorize the said city inspector to enter into the said agreement with the said William H. Woodruff, for or on behalf of the defendants, or to bind the defendants in relation thereto," and that the defendants were entitled to judgment in their favor.

The plaintiff appealed from the judgment entered on the report of the referee to the General Term, where the same was affirmed with opinion of the court by —

DALY, F. J.—I have no doubt of the power of the Board of Health to direct an act to be done, involving the necessity of entering into a contract in a matter coming within the prescribed sphere of its duties, and that a contract thus entered into is binding upon the Corporation; I also agree that there are cases in which that body, or the Common Council, may authorize contracts to be entered into involving a larger expenditure than $250, without advertising for sealed proposals, as required by the act of 1857 [Laws of 1857, vol. 1, p. 886, § 38]. We held, in *Smith* v. *The Mayor, &c. of New York*, that a resolution of the Common Council, authorizing members of committees to hire carriages when engaged in transacting the business of their committees, conferred a valid authority to engage carriages when thus occupied; that contracts of such a nature were not designed to be embraced by the act of 1857, although the amount expended in this way exceeded $250. In the administration of the affairs of the city, there are necessarily cases in which it was never intended that there should be ten days' advertisement for sealed proposals before a contract could be entered into—cases where, from the nature of the things to be done, the contract must be entered into at once. As an illustration, an action was tried before me recently, in which it appeared that, in lowering the grade of one of the public avenues of the city, a number of trenches were suddenly exposed, in which the dead had been buried during a pestilence that occurred about forty years ago. When the excavation had proceeded to a certain depth, the thin wall of earth, which had previously concealed this forgotten place of sepulture, suddenly gave way, and piles of the old and decayed coffins, which had been deposited one upon the other, fell in a mass into the avenue. It was in the month of August, and the most urgent public necessity demanded that the decayed coffins and their pestilential contents should be removed, with all possible expedition, to a place beyond the limits of the city. The City Inspector was accordingly directed by the Board of Health to engage persons at once to do so, in pur-

McLaren v. Mayor &c. of New York.

suance of which he made a contract involving an expenditure of several thousand dollars, and I had no hesitation in holding that the contract so made was valid and binding upon the Corporation. But the provision in the statute, requiring a publication for ten days for sealed proposals, must be complied with in every case where it can be done without detriment to the public interest; and to warrant a departure from it, the case must be one of public necessity, or one to which it is obvious the statute was never designed to apply. The present is not such a case. The resolution of the Board of Health directed the City Inspector to employ the plaintiff's assignor to remove, temporarily and until further ordered, all the contents of the sinks and privies of the city at certain specified rates.

This resolution was passed in June, 1858, and under it a contract was entered into by the City Inspector with the plaintiff's assignor, William H. Woodruff, to remove, until further ordered by the Board of Health or the Common Council, all the contents of the sinks and privies of the city at certain specified rates. This was a contract of a very extensive nature, involving a large expenditure of money. It contemplated the possibility of his employment for a period of more than six months, as it was expressly provided that, if employed for that space of time, the rate of compensation should be less, and it was proved in the case that Woodruff entered upon the performance of the work the day after the resolution was passed, and continued to perform it until the 18th day of May, 1859, a period of more than eleven months, and the plaintiff offered to show that the Corporation had paid for the work so done more than $18,000. No plea of public necessity could justify the Board of Health in contracting for so extensive an amount of work as this, without putting up the contract to public competition, in the manner required by the statute. It would have involved but a delay of ten days to publish the notice required by statute; and as it was but the beginning of June, there could be no ground in public necessity for entering into a contract of such a nature at once. The conclusion of the Referee, therefore, was correct, and the judgment entered upon his report must be affirmed. It has been urged that the statute applies only to contracts made by the authority of the Common Council; but, after a careful examination of its

McLaren v. The Mayor &c. of New York. ·

provisions I am satisfied that it applies to any contracts for work furnished for the Corporation where the amount to be expended exceeds $250.

The work here was done for the Corporation, of which the Board of Health is merely a co-ordinate part..

The judgment is affirmed.

On the motion of plaintiff, a re-argument was had at the next General Term, when the judgment was reversed, with opinion of the Court by Hilton, J.

*Charles Jones* for appellant.
*H. H. Anderson* for respondents.

By the Court.—Hilton, J.—At a meeting of the Board of Health of the city of New York, on June 11th, 1858, at which was present Mayor Tieman, twelve aldermen, and sixteen councilmen, the following preamble and resolution was passed, receiving the vote of the Mayor, seven aldermen, and eleven councilmen, the remaining members present voting against it :

"Whereas, the City Inspector has reported at his office over one thousand sinks and privies full, and no provision being made by the Common Council for the carrying away of their contents, the nuisance has become intolerable.    Therefore, *Resolved*, That the city inspector be appointed to empower William H. Woodruff to *remove temporarily*, or until further ordered by this Board *or the Common Council*, all the contents of sinks and privies of this city beyond the harbor, without nuisance, provided the rates of compensation shall not exceed $50 per week for boats of fifty tons burthen, and in the same ratio for boats of larger proportions.    And that the city inspector be directed to order the work of removing the night soil to be commenced to-morrow evening."

Under the authority of this resolution, the city inspector entered into the contract by it directed to be made, providing, however, that if the employment should continue for a term of six months, the compensation should be only at the rate of $40 per week, instead of $50 for each boat.

Woodruff forthwith entered upon the performance of this work by providing the necessary boats, etc., in which he removed the contents of all sinks and privies delivered to him at the wharf, beyond the harbor of New York city, and without

McLaren v. The Mayor &c. of New York.

nuisance. He thus continued down to and including May 18th, 1859, all his bills for work and services under the contract having been approved and certified by the city inspector, and the work declared done in a satisfactory manner. The bills thus approved and certified for the period of time from April 29th to and including May 18th, 1859, amounting to $3,360 80 with interest, having been duly assigned to the plaintiff, he brings this suit for their recovery.

At the trial before the Referee, after these facts had been established, the plaintiff offered to prove that the defendants had paid Woodruff for all the work done by him under the contract prior to January 1st, 1859, a period of over six months, at the rate specified. That for a portion of such services an action had been commenced against the defendants, and on November 29th, 1858, a judgment was recovered against them therein by default for $18,296.84, which was paid in the following April. And that the plaintiff, when he purchased the claim in this suit, knew of the previous payments by the defendants and of the said judgment. The evidence thus offered was ruled out by the referee, and to this ruling the plaintiff excepted.

Judgment having been given for the defendants, the plaintiff appeals, and thus it becomes necessary to inquire into the nature of the powers conferred upon the Board of Health, and to determine whether they were authorized to direct the making of the contract in question. The points involved are purely legal, it not having been intimated that the city was unfaithfully served during the period claimed, or at a rate of compensation at all objectionable.

In April, 1850, there was what might be termed a codification of all the laws relating to health in the city of New York, [See Laws 1850, ch. 275, p. 597], and the act then passed embodies all the powers under which the Board claimed the right to make the contract with Woodruff. Its first title declares that all legislative powers theretofore vested by any law of the State in the Board of Health of the city, other than as therein altered or modified, shall be vested in the Mayor and Common Council of the city, who, when acting in relation to the public health, or in the execution of their powers, shall be known as the Board of Health of the city of New York, and of which ten members shall be necessary to form a quorum. Also, that

the president of the Board of Aldermen, and of the assistants (now Councilmen), the health officers, resident physicians, the health commissioners and city inspector shall be commissioners of health, who, in connection with the mayor, are required to meet daily at the office of the Board during such part of the year as the Board shall designate; thus providing the means for immediate action in all matters affecting the public health; the mayor, as president of the Board, being authorized to convene it at any time he shall deem it necessary so to do; and the object of this daily meeting of the commissioners being obviously for the purpose of bringing to him information respecting the health of the city, by calling daily together all the officials especially entrusted with its preservation.

Passing over the many sections of the act not necessary to be here adverted to, we find in its third title very full and ample powers and discretion vested in the city inspector, health wardens, the mayor, aldermen, and commonalty, the mayor and commissioners, and the board of health, all tending to the public good, and enabling the particular board or officer designated to act speedily and promptly in all cases when action of that kind may seem beneficial towards preserving the health of the people. We are referred to section 6 of this title, as conferring the power upon the Board to make the contract in question. I therefore give it in full:

" The Board of Health, or the Mayor and the Commissioners of Health, when they shall judge it necessary, may cause any cargo, or part of cargo, or *any matter or any thing* within the city that may be putrid or otherwise dangerous to the public health, to be destroyed or removed. Such removal, when ordered, shall be to the quarantine ground, or such other place as the Board of Health shall direct. Such removal or destruction shall be made at the expense of the owner or owners of the property so removed or destroyed; and the same may be recovered from such owner or owners in an action at law by the mayor, aldermen, and commonalty of said city."

This section, in connection with sec. 27 of the charter of 1857, [See Laws, ch. 446, p. 883], which provides for " an executive department of the city government known as the

Jaroslauski v. Saunderson.

"their direction. Z. W. Saunderson, Asssignee of Thomas
· "Monroe & Co."

Saunderson then informed the holders of the note of the re-
ceipt of the flour by him, and of the purpose for which he had
received it, and they withdrew the note from bank, where it
had been placed for collection. On August 10, 1861, no de-
mand having been made on the plaintiffs for payment of the
note, and no notice of any intention to sell the flour having
been given them, the defendant sold the flour for the then
market price—*viz.* $4 35 per barrel.

On December 24th, 1861, the plaintiffs demanded the flour
from Saunderson, and made him an offer to pay the note and
expenses. He informed them that he had sold the flour. On
· April 9th, 1862, the demand and offer was renewed, and the
same answer made.

Upon this the plaintiffs brought an action against Saunder-
son for converting the flour to his own use, and claimed to
recover the whole value of the flour, which they fixed at $600.
The defendant was held to bail in $600 ; and a motion was
made to discharge him, or reduce his bail.

The Court, at Special Term, denied the motion to discharge
the defendant from arrest, and refused to reduce his bail, HIL-
TON J. rendering the following opinion :

HILTON J.—The receipt given by the defendant at the time
the bill of lading for the flour was transferred to him, clearly
shows that the transfer was made and intended for collateral
security for the payment of the note held by Mason, Lawrence
& Co., to whom it had been previously transferred by Thomas
Monroe & Co. There was no special power of sale given to the
defendant, but, on the contrary, the receipt indicates that the
plaintiffs reserved to themselves the right to control and direct
any disposition which was to be made of the flour.

The transaction was clearly a pledge, requiring a demand of
the plaintiffs to be first made for the payment of the note, to
authorize a sale of the flour ; and, in addition, the plaintiffs were
entitled to reasonable and personal notice of the sale intended.

It appears that neither notice to redeem, nor notice of the
sale, was given the plaintiffs, and it thus became optional with
them to treat such an unauthorized disposition of their proper-
ty, as the affidavits show has been made by the defendant, as

Fisher v. Merwin.

a wrongful conversion of it, and maintain an action of trover for its value. *Stearns* v. *Marsh*, 4 Denio 227. The papers submitted show that this is such an action.

Therefore, the motion to vacate the order of arrest must be denied.

From the order denying the motion, the defendant appealed to the General Term.

*Buckham, Van Cott & Bangs*, for appellants.

*Abbott & Fuller*, for respondent.

BY THE COURT.—BRADY, J.—In addition to the reasons assigned by Judge HILTON, in denying the motion to discharge the order of arrest in this case, it may be said that the cause of action is in tort, and that in such cases where the claim is sworn to positively, the order of arrest will not be disturbed on conflicting affidavits as to the right of action. The merits cannot be considered and disposed of upon affidavits.

The order of the Special Term must be affirmed with $10 costs.

FISHER *v.* MERWIN *and* BRAY.

Where a vendor, at the time of the sale, agrees, that if the goods when deliver are inferior to the sample, they may be exchanged, it is a conditional sale, and the inferiority of the goods is no defence to an action for the price. The vendee should, on discovering the quality of the goods, tender them back to the vendor, or at least notify him of the defect; and failing to do so, he is estopped from denying their value.

This action was brought to recover the price of certain pistols sold by the plaintiff to the defendants. The defendants set up; First, that the sale was by samples, and that the pistols delivered were inferior to the samples, and Secondly, that the

Fisher v. Merwin.

sale was brought about by false representations of the vendor. On the trial, it appeared that the defendants had examined the samples, and had been informed by the plaintiff, that he, the plaintiff, was no judge of pistols; that they were represented to plaintiff as good, and if they were not equal to the samples, could be exchanged, and that a portion of the pistols had, under this sale, been actually exchanged. Evidence of the inferiority of the pistols was offered, and also evidence to show false representations on the part of the plaintiff. The evidence was excluded, and judgment given for plaintiff.

From this judgment the defendant appealed.

By THE COURT.—BRADY, J.—The defendants urged as defences in this case : First, that the sale was by samples, and that the pistols delivered were inferior to the samples; Secondly, that the sale was accomplished by false representations as to the cost of the pistols. The plaintiff testified that the defendants examined the samples, that he said he supposed the rest were like them, that he told them he was no judge, but that the pistols were represented to him as good and merchantable, and if not so, could be exchanged. The defendants did not deny these statements of the plaintiff. The defendant Merwin did not deny that the pistols to be delivered could be exchanged, if not equal to the sample. On the evidence therefore the sale was a conditional one, the defendants having the right to exchange any of the pistols not equal to the sample. For this reason, the first defence interposed failed, and the questions excluded relating to it were properly rejected. It may be said in addition and as corroborative of the plaintiff's statement, that the defendants did exchange some of the pistols delivered, but made no offer to exchange the lot for the price of which this action was brought. The evidence of the defendant, Merwin, also shows, that the purchase was based upon the quality of the pistols as shown by the samples, and not upon the representation of the plaintiff as to the cost of them. He does not state that he was induced to give the price named by the representation of the plaintiff as to the cost of the pistols, but said, "plaintiff showed me a sample of

pistols, which was a very good one. I said if they were equal to the sample I would take the lot." For this reason, I think the questions which related to that defence were properly excluded. The plaintiff agreed to exchange the pistols if not equal to the sample, and the defendant agreed to purchase if the pistols to be delivered were like the sample shown. The plaintiff made no warranty and the defendant a conditional agreement. The plaintiff's statement is not denied, and the defendant was not bound to accept. The defendant was bound to return the goods in such a case or notify the plaintiff of the alleged defect, which he did not do. For these reasons the judgment should be affirmed.

### SYLVESTER S. MANGUM v. HARVEY P. FARRINGTON.

The right to distrain for wharfage was not taken away by the Act of 1846, abolishing distress for rent, nor by the act of 1860 " in relation to the rates of wharfage," &c. The reference, in the latter act, to section 207 of the Act of April 9th, 1813, is clearly a mistake, and the statute being a remedial one will be construed as a reference to section 217 of the same act.

A written contract may be interpeted by the local customs in reference to which it was made, and it is error to exclude evidence of such customs.

As between the lessor of a bulkhead and the lessor of the adjoining pier, evidence of the custom of the port is admissible to show how far wharfage is collectible for the use of bulkhead, and to what extent for the use of the pier.

The defendant in this case, being the lessee of the pier at the foot of Laight street, levied upon property in two barges for his wharfage. It appeared upon the trial that the two barges were not fastened to the pier, but lay in the slip, and that they were third or fourth from the bulkhead. The plain-

Mangum v. Farrington.

tiff, who was also lessee of the bulkhead in front of which the barges lay, brought suit to recover the articles levied upon, claiming that the remedy by distress was abolished, and also that he, as lessee of the bulkhead, was entitled to the wharfage. The defendant offered proof of a custom, that the lessee of the bulkhead should be allowed to collect wharfage from only the boat alongside the bulkhead and the next boat beyond. This evidence was excluded and exception taken. It was admitted that the proceedings on the distress were regular, if the remedy by distress was still allowed. Judgment was given for the plaintiff, and the defendant appealed.

BRADY J.—The defendant was the lessee of the small pier at the foot of Laight street, North River, and the plaintiff was the lessee of the bulkhead between Hubert and Laight streets, North river, on each side of the small pier. The barges Huron and Raymond were in the slip, and third or fourth from the bulkhead, and "lay next to the little pier at foot of Laight street." There were at least two vessels between them and the bulkhead, and the defendant claimed to be entitled to wharfage for those barges, and to the right to distrain for it, if not paid. He did distrain, and, to recover the property which he took by distress, this action was brought. The proceedings upon the distress were admitted to be regular. The plaintiff insisted, however, that the defendant was not entitled to wharfage, but if entitled to it could not make it by distress, that remedy having been abolished by statute. The barges named were not fastened to the defendant's pier, and his right to wharfage seems to depend upon an alleged universal custom, in this city, by which the owner or lessee of the bulkhead, is not allowed to collect wharfage for more than two vessels—that is, the vessel alongside of the bulkhead, and one outside of her. The defendant offered to prove such a custom, but an objection being made, the proof was excluded and judgment given for the plaintiff. I think the proof should have been received. The bulkhead is a structure built up along the river bank, and piers extend from it at right angles toward the channel of the river. If the lessee of the bulkhead could locate his vessels in a line from the bulkhead to the end of the pier, the use of the pier could be destroyed, and if the lessee of the pier could

dispose of his vessels laterally and consecutively from the pier without restriction, the use of the bulkhead would be comparatively valueless. The lease is silent on this subject, and it would seem, under the circumstances, to be one for interpretation by a local custom. Such a custom may not only be resorted to in explanation of contracts, but the contracting parties are supposed to have made their engagements in reference to it.

Every demise between landlord and tenant in respect to matters on which the parties are silent, may be fairly open to explanation by the general usage and custom of the country or of the district where the land lies. Every person is supposed to be cognizant of the custom, and to contract with a tacit reference to it. *Vanneso* v. *Pacard*, 2 Peters U. S. R. 148; *Wigglesworth* v. *Dalleson*, Douglass, 201; *Wilcox* v. *Wood*, 9 Wend. 346.

The plaintiff in taking his lease of the bulkhead, and the defendant in taking his lease of the small pier, must be presumed to have taken it with knowledge of the custom, and are as much controlled by it, as if the effect were stated in their respective leases. If therefore the right to distrain for the wharfage claimed existed, when the right was exercised, the judgment should be reserved.

HILTON J.—By section 217 of the "act to reduce several laws relating particularly to the City of New York into one act, passed April 9th, 1813 (see 2 R. Laws, 430; *Davies' Laws*, 553), it was provided, that when any vessel has laid twenty-four hours at any wharf, and the master or owner refuses or neglects to pay the wharfage, or give security therefor, being thereunto required by the owner or wharfinger, by notice in writing left on board with the mate or one of the hands belonging to the vessel, it shall and may be lawful for the owner or wharfinger to distrain for such wharfage, on any goods or chattels found on board such vessel, and so from time to time as often as twenty-four hours' wharfage shall become due, and the goods and chattels so distrained, to sell and dispose of, in the same manner as is provided in the case of rent.

Thus where the wharfage is not paid or secured, the owner of the wharf may from time to time, and as often as twenty-

Mangum v. Farrington.

four hours' wharfage becomes due, proceed on board the vessel and take therefrom and keep sufficient goods and chattels, as a pledge and security for the payment of the wharfage so distrained for, the distress being in all cases proportioned to the amount owing.    (3 Black. C. 12 ; *Burrill's Law Dict'y*—Distrain.)

If the wharfinger desires to sell and dispose of the goods and chattels thus acquired by distress, he is required to proceed in conformity with the statute in respect to sales of property taken upon a distress for rent; that is, give five days public notice of sale, and at the day and place appointed in the notice, sell the goods at public auction for the best price that can be obtained. Of course, after applying the proceeds to the payment of the expenses of the distress sale and the wharfage, the owner will be entitled to have any surplus returned to him.    (See 2 R. S. sec. 26, 504.)

The act of 1846, p. 369, abolishing distress for rent, in no way affects the right thus given to distrain for wharfage, nor does it in terms repeal the 26th section of the R. S. to which I have referred.   The language used in the act of 1846 is merely " Distress for rent is hereby abolished," thus leaving it to be inferred that the legislature did not intend by it to repeal absolutely, and for every purpose, all the provisions of the Revised Statutes then existing relating to proceedings upon a distress for rent, because those provisions were applicable in some respects to cases of distress like the one in question for non-payment of wharfage.   But even if all those provisions had been expressly repealed, it would not have affected the right of the wharfinger to distrain and sell under the act of 1813, as reference might still be had to a repealed statute for the purpose of ascertaining the manner in which goods and chattels thus taken in pledge under the authority of an existing law might be disposed of.

Nor can it be said that the " Act in relation to the rates of wharfage," &c. passed April 10, 1860 (See Laws, 1860, p. 416), took away or in any manner affected or abrogated this right; but on the contrary, in my opinion the right was expressly affirmed by it. This act, after establishing a higher rate of wharfage than was theretofore allowed, declaring, however,

that it should not affect the rates chargeable by the then exist-
ing laws on lighters, canal boats, or barges (See chap. 266,
Laws 1852; Davies' Laws, p. 1089), and enacting that the
wharfage should .be a lien on the vessel, provided by sec. 7,
that the collection of the rates of wharfage thereby established.
shall be enforced in the manner prescribed in the 207th section
of the act of April 9th, 1813 (*supra*).

This reference to the 207th section is clearly a mistake of
the framers of the law, the 217th section being manifestly the
one intended. Therefore, in cases of remedial statutes like
this, when it is obvious that a special remedy was designed to
be given to a particular class of persons in certain cases, it is
the duty of courts to apply a liberal and equitable rule of con-
struction, even though the construction put upon the statute be
contrary to the letter of it. (*Dwarris on Stat.* 718.) A thing
within the letter of a statute is not within the statute, unless it
be within the intention of the makers. (*The People* v. *Utica
Ins. Co.*, 15 Johns. R. 358, 379; *Jackson* v. *Collins*, 3 Cowen, 89.)

The propriety of this rule is illustrated in the present in-
stance. Section 207 thus referred to relates to cases where a
party has been fined - by a magistrate for breaking any glass
lamp, window-porch, knocker, or other fixture in the city, and
refuses payment of the fine or forfeiture imposed therefor,
and there is no sufficient distress on which the same may be
levied, he may be committed to Bridewell by the magistrate,
there to remain without bail or mainprize for the space of two
months, or until such forfeiture and costs are paid : and when
the offence is committed by any slave, apprentice, or ser-
vant, the forfeiture shall be paid by the master, or in default
thereof, ine servant may be so committed. It will not for a
moment be supposed that the legislature designed to incorpo-
rate in the act of 1860, as a means for collecting the rates of
wharfage therein allowed to wharfowners, provisions like these,
so clearly inapplicable to the collection of wharfage, and espe-
cially when the forfeiture thus imposed goes toward supplying
new lamps and for the support of the poor (see section 206).

We should therefore hold that section 217 of the act of 1813
was the one intended to be referred to, and that under its pro-
visions the defendant was .authorized to. proceed by distress
for the wharfage due him in the manner admitted at the trial.

Its non-payment gave him the right to proceed on board the vessels and distrain upon the property in question, and the plaintiff was not entitled to its return without a payment or tender of the amount arising for wharfage, and the expenses necessarily incurred in making the distress. This not having been done, he has no cause of action, and the judgment of the Justice to the contrary should be reversed.

In conclusion, I will add that I fully concur in the views of Judge Brady respecting the admissibility of the evidence offered by the defendant at the trial, upon the question of usage, and as to the effect of that evidence if it had been admitted.

Judge DALY concurred.

———————

ABNER BENEDICT *and* WILLIAM E. THORNE *v.* WILLIAM DUNNING.

The defendant agreed to take a loan which had been negotiated by the plaintiffs for one Schoonmaker, and to pay the expenses incurred by the plaintiffs in searching the title to the premises on which the loan was to be made, and also to pay for services rendered by the plaintiffs.

*Held*, That the agr̲  ̲ent was not void as being collateral, and without consideration.

Appeal by the defendant from a judgment of the Seventh District Court.

The plaintiffs agreed to use their influence in causing a loan to be made to one Schoonmaker of $7000 upon certain property in Broadway. Upon this property defendant held a third mortgage. A second mortgage had passed to a decree of foreclosure, and defendant expecting that he would have to purchase at the sale, wanted the $7000, to enable him to pay off the prior mortgages, taxes, etc. Plaintiffs made the requisite searches, but Schoonmaker not being in a condition to perform the agreement on his part for the loan, the defendant, [being

16

in need of money to pay off the two mortgages prior to his], went to plaintiff's office, where it was agreed by parol that plaintiffs should cause the $7000 to be loaned to defendant on the Broadway property, and to make a further search as to the foreclosure proceedings, and further to cause the $7000 to be kept for the defendant until it was determined whether defendant became purchaser on such foreclosure sale. Defendant agreed to take said loan, and pay plaintiffs for their services, provided he became the purchaser on the sale. Plaintiffs completed the search, and caused the money to be retained and tendered to defendant. Defendant became the purchaser on such sale, but refused to take the loan, or pay plaintiffs for their services.

. Judgment was rendered for the plaintiff, and defendant appealed to the Court.

*George W. Stevens* for appellant.

I. The promise of the appellant was a collateral undertaking to the original liability of Schoonmaker, and not being in writing is void (2 R. S. 135, § 2; *Carville* v. *Crane*, 5 Hill, 483).

II. The promise of the appellant to pay the respondents for the services was in any event contingent upon his accepting. the loan. As 'he did not accept the loan, no original liability upon his part attached.

III. The services of the respondents were already performed for Schoonmaker. They did not surrender or give up their claim against him, and hence there can be no original liability of the appellant to them for the same services for which Schoonmaker is still liable to them (*Mallory* v. *Gillett*, 21 N. Y. R. 412).

*Benedict and Thorn* for respondents.

· By THE COURT.—BRADY, J.—In this case the evidence shows that the defendant agreed to take a loan which had been negotiated for one Schoonmaker, and to pay the expenses incurred by the plaintiffs in searching the title to the premises on which the loan was to be made, and also to pay for the services rendered by the plaintiffs. It is true that Schoonmaker was liable to the plaintiffs, but the defendant assumed the responsi-

McLaren v. Mayor, &c. of New York.

bility which had accrued in consideration of the transfer to him of the subject matter of such liability, and was, by his arrangement with the plaintiffs, to receive the entire benefit of such expenditure as had been made, and such services as had been performed for Schoonmaker. The consideration of the promise by Schoonmaker was the loan, and such was also the consideration of the promise by the defendant. It was a new promise, to the effect that if the plaintiffs would transfer the loan to him, he would pay them the same charge that they would receive from Schoonmaker had the loan been made to him. Not only was that the agreement, but the defendant also promised to pay $25 for such services in addition as would be necessary to make the transfer in due form to secure the mortgagee. The money was ready, and was kept in abeyance, awaiting the convenience of the defendant, and subject to his order. This was a further consideration for the promise. I think this case is controlled by the principles laid down in *Mallory* v. *Gillett*, 21 N. Y. Rep., 412, and that the judgment should be affirmed.

Judgment affirmed.

JOHN J. McLAREN *v.* THE MAYOR, ALDERMEN AND COMMONALTY OF NEW YORK.

The City Inspector of the city of New York, being authorized by a resolution of the Board of Health to employ the plaintiff's assignor " to remove temporarily, or until further ordered by the Board or the Common Council, all the contents of the sinks and privies of the city beyond the harbor," made a contract accordingly, fixing the rate of compensation, as directed by the resolution, at fifty dollars per week for the first six months, and forty dollars per week for the time after that period.

*Held*, That such contract was within the power conferred on the Board of Health by section 6 of the act of 1850, ch. 275, title 3, and section 27 of the act of 1857, ch. 446 ; and the Corporation was chargeable with the expenses arising from the employment of the plaintiff's assignor.

*Held further*, That it being competent, by the terms of the contract, for the defendants or the Board of Health to terminate it at any moment, it could not be deemed a continuing contract, or as invading the powers of the Common Council as prescribed by the charter, to make contracts for the same work.

---

McLaren v. Mayor, &c. of New York.

---

*Held further*, That such contract was not in violation of section 38 of the charter of 1857, requiring all contracts involving an expenditure of over $250 to be founded upon sealed bids and proposals.

*It seems*, That the provisions of section 38 of the charter of 1857 apply only to contracts to be let by authority of the Common Council, and were never intended to apply to the Board of Health.

The Courts have no power, in collateral proceedings, to inquire whether the facts upon which a Board of Health determines a thing to be a nuisance justify its conclusion.

Appeal by the plaintiff from a judgment entered on the report of a referee at Special Term.

The action was brought by the plaintiff as the assignee of one Woodruff, to recover the sum of $3,360.80 from the Corporation for work and services in removing beyond the harbor the contents of the sinks and privies of the city. The contract under which the services were rendered was made with Woodruff by the City Inspector, under the authority of a resolution of the Board of Health. The agreement thus entered into was as follows :—" Agreement made this 12th day of June, in the year one thousand eight hundred and fifty-eight, between Wm. H. Woodruff, of Newark, in the State of New Jersey, of the first part, and George W. Morton, city inspector of the city of New York, of the second part: Whereas, by a resolution adopted by the Board of Health of the city of New York, at a meeting held by them at said city, on the 11th day of June, in the year 1858, it was *Resolved*, ' That the city inspector be empowered to employ Wm. H. Woodruff to remove temporarily, or until further ordered by this Board or the Common Council, all the contents of the sinks and privies of this city beyond the harbor, without nuisance, provided the rates of compensation, including all expenses, shall not exceed the sum of fifty dollars per week for boats of fifty tons burthen, and in the same ratio for boats of larger proportions, and that the city inspector be directed to order the work of removing the night soil to be commenced to-morrow evening.'

" Now, therefore, this agreement witnesseth, that, in conformity with the above resolution, the said William H. Woodruff has agreed with the said party of the second part as follows :

" That he, the said William H. Woodruff, will, as long as the

city inspector shall, under said resolution, employ him to do the work aforesaid, do and perform the same as is provided for and upon the terms stated in said resolution, and in case he shall be employed to do such work for the space of six months from and including the date hereof, the price to be paid to him therefor shall be only forty dollars for boats of fifty tons burthen, and in the same ratio for boats of larger proportion, instead of fifty dollars as is provided in said resolution.

" And the said party of the second part hereby, on behalf of the city of New York, and in pursuance of said resolution, agrees with the said Woodruff as follows :—That for the services herein on the part of said Woodruff, agreed to be done and performed, he, the said Woodruff, shall be entitled to receive as a compensation the price or rate stated in said resolution, provided, however, that if he, the said Woodruff, shall be employed as aforesaid for the term of six months, he shall be entitled to receive from the said city of New York only the sum of forty dollars per week, as is hereinbefore in the agreement on the part of said Woodruff contained.

(Signed)          " W. H. WOODRUFF.

" City Inspector's Department.

" This will certify, that so far (and by virtue of authority of the Board of Health) as the foregoing resolution may empower me so to do, that I have employed Mr. Wm. H. Woodruff to furnish vessels to receive and remove night soil from the city on the terms above set forth.

(Signed)          " GEO. W. MORTON,

" City Inspector."

The work was performed by Woodruff, and the bills therefor were examined and respectively approved by the city inspector.

The case was referred to Hamilton W. Robinson, Esq. as sole referee to hear and determine. He found as a conclusion of law that " the said Board of Health had no power or authority to authorize the said city inspector to enter into the said agreement with the said William H. Woodruff, for or on behalf of the defendants, or to bind the defendants in relation thereto," and that the defendants were entitled to judgment in their favor.

The plaintiff appealed from the judgment entered on the report of the referee to the General Term, where the same was affirmed with opinion of the court by —

DALY, F. J.—I have no doubt of the power of the Board of Health to direct an act to be done, involving the necessity of entering into a contract in a matter coming within the prescribed sphere of its duties, and that a contract thus entered into is binding upon the Corporation; I also agree that there are cases in which that body, or the Common Council, may authorize contracts to be entered into involving a larger expenditure than $250, without advertising for sealed proposals, as required by the act of 1857 [Laws of 1857, vol. 1, p. 886, § 38]. We held, in Smith v. The Mayor, &c. of New York, that a resolution of the Common Council, authorizing members of committees to hire carriages when engaged in transacting the business of their committees, conferred a valid authority to engage carriages when thus occupied; that contracts of such a nature were not designed to be embraced by the act of 1857, although the amount expended in this way exceeded $250. In the administration of the affairs of the city, there are necessarily cases in which it was never intended that there should be ten days' advertisement for sealed proposals before a contract could be entered into—cases where, from the nature of the things to be done, the contract must be entered into at once. As an illustration, an action was tried before me recently, in which it appeared that, in lowering the grade of one of the public avenues of the city, a number of trenches were suddenly exposed, in which the dead had been buried during a pestilence that occurred about forty years ago. When the excavation had proceeded to a certain depth, the thin wall of earth, which had previously concealed this forgotten place of sepulture, suddenly gave way, and piles of the old and decayed coffins, which had been deposited one upon the other, fell in a mass into the avenue. It was in the month of August, and the most urgent public necessity demanded that the decayed coffins and their pestilential contents should be removed, with all possible expedition, to a place beyond the limits of the city. The City Inspector was accordingly directed by the Board of Health to engage persons at once to do so, in pur-

McLaren v. Mayor &c. of New York.

suance of which he made a contract involving an expenditure of several thousand dollars, and I had no hesitation in holding that the contract so made was valid and binding upon the Corporation. But the provision in the statute, requiring a publication for ten days for sealed proposals, must be complied with in every case where it can be done without detriment to the public interest; and to warrant a departure from it, the case must be one of public necessity, or one to which it is obvious the statute was never designed to apply. The present is not such a case. The resolution of the Board of Health directed the City Inspector to employ the plaintiff's assignor to remove, temporarily and until further ordered, all the contents of the sinks and privies of the city at certain specified rates.

This resolution was passed in June, 1858, and under it a contract was entered into by the City Inspector with the plaintiff's assignor, William H. Woodruff, to remove, until further ordered by the Board of Health or the Common Council, all the contents of the sinks and privies of the city at certain specified rates. This was a contract of a very extensive nature, involving a large expenditure of money. It contemplated the possibility of his employment for a period of more than six months, as it was expressly provided that, if employed for that space of time, the rate of compensation should be less, and it was proved in the case that Woodruff entered upon the performance of the work the day after the resolution was passed, and continued to perform it until the 18th day of May, 1859, a period of more than eleven months, and the plaintiff offered to show that the Corporation had paid for the work so done more than $18,000. No plea of public necessity could justify the Board of Health in contracting for so extensive an amount of work as this, without putting up the contract to public competition, in the manner required by the statute. It would have involved but a delay of ten days to publish the notice required by statute; and as it was but the beginning of June, there could be no ground in public necessity for entering into a contract of such a nature at once. The conclusion of the Referee, therefore, was correct, and the judgment entered upon his report must be affirmed. It has been urged that the statute applies only to contracts made by the authority of the Common Council; but, after a careful examination of its

provisions I am satisfied that it applies to any contracts for work furnished for the Corporation where the amount to be expended exceeds $250.

The work here was done for the Corporation, of which the Board of Health is merely a co-ordinate part.

The judgment is affirmed.

On the motion of plaintiff, a re-argument was had at the next General Term, when the judgment was reversed, with opinion of the Court by Hilton, J.

*Charles Jones* for appellant.
*H. H. Anderson* for respondents.

By the Court.—Hilton, J.—At a meeting of the Board of Health of the city of New York, on June 11th, 1858, at which was present Mayor Tieman, twelve aldermen, and sixteen councilmen, the following preamble and resolution was passed, receiving the vote of the Mayor, seven aldermen, and eleven councilmen, the remaining members present voting against it:

"Whereas, the City Inspector has reported at his office over one thousand sinks and privies full, and no provision being made by the Common Council for the carrying away of their contents, the nuisance has become intolerable. Therefore, *Resolved,* That the city inspector be appointed to empower William H. Woodruff to *remove temporarily*, or until further ordered by this Board *or the Common Council*, all the contents of sinks and privies of this city beyond the harbor, without nuisance, provided the rates of compensation shall not exceed $50 per week for boats of fifty tons burthen, and in the same ratio for boats of larger proportions. And that the city inspector be directed to order the work of removing the night soil to be commenced to-morrow evening."

Under the authority of this resolution, the city inspector entered into the contract by it directed to be made, providing, however, that if the employment should continue for a term of six months, the compensation should be only at the rate of $40 per week, instead of $50 for each boat.

Woodruff forthwith entered upon the performance of this work by providing the necessary boats, etc., in which he removed the contents of all sinks and privies delivered to him at the wharf, beyond the harbor of New York city, and without

nuisance. He thus continued down to and including May 18th, 1859, all his bills for work and services under the contract having been approved and certified by the city inspector, and the work declared done in a satisfactory manner. The bills thus approved and certified for the period of time from April 29th to and including May 18th, 1859, amounting to $3,360 80 with interest, having been duly assigned to the plaintiff, he brings this suit for their recovery.

At the trial before the Referee, after these facts had been established, the plaintiff offered to prove that the defendants had paid Woodruff for all the work done by him under the contract prior to January 1st, 1859, a period of over six months, at the rate specified. That for a portion of such services an action had been commenced against the defendants, and on November 29th, 1858, a judgment was recovered against them therein by default for $18,296.84, which was paid in the following April. And that the plaintiff, when he purchased the claim in this suit, knew of the previous payments by the defendants and of the said judgment. The evidence thus offered was ruled out by the referee, and to this ruling the plaintiff excepted.

Judgment having been given for the defendants, the plaintiff appeals, and thus it becomes necessary to inquire into the nature of the powers conferred upon the Board of Health, and to determine whether they were authorized to direct the making of the contract in question. The points involved are purely legal, it not having been intimated that the city was unfaithfully served during the period claimed, or at a rate of compensation at all objectionable.

In April, 1850, there was what might be termed a codification of all the laws relating to health in the city of New York, [See Laws 1850, ch. 275, p. 597], and the act then passed embodies all the powers under which the Board claimed the right to make the contract with Woodruff. Its first title declares that all legislative powers theretofore vested by any law of the State in the Board of Health of the city, other than as therein altered or modified, shall be vested in the Mayor and Common Council of the city, who, when acting in relation to the public health, or in the execution of their powers, shall be known as the Board of Health of the city of New York, and of which ten members shall be necessary to form a quorum. Also, that

the president of the Board of Aldermen, and of the assistants (now Councilmen), the health officers, resident physicians, the health commissioners and city inspector shall be commissioners of health, who, in connection with the mayor, are required to meet daily at the office of the Board during such part of the year as the Board shall designate; thus providing the means for immediate action in all matters affecting the public health; the mayor, as president of the Board, being authorized to convene it at any time he shall deem it necessary so to do; and the object of this daily meeting of the commissioners being obviously for the purpose of bringing to him information respecting the health of the city, by calling daily together all the officials especially entrusted with its preservation.

Passing over the many sections of the act not necessary to be here adverted to, we find in its third title very full and ample powers and discretion vested in the city inspector, health wardens, the mayor, aldermen, and commonalty, the mayor and commissioners, and the board of health, all tending to the public good, and enabling the particular board or officer designated to act speedily and promptly in all cases when action of that kind may seem beneficial towards preserving the health of the people. We are referred to section 6 of this title, as conferring the power upon the Board to make the contract in question. I therefore give it in full:

"The Board of Health, or the Mayor and the Commissioners of Health, when they shall judge it necessary, may cause any cargo, or part of cargo, or *any matter or any thing* within the city that may be putrid or otherwise dangerous to the public health, to be destroyed or removed. Such removal, when ordered, shall be to the quarantine ground, or such other place as the Board of Health shall direct. Such removal or destruction shall be made at the expense of the owner or owners of the property so removed or destroyed; and the same may be recovered from such owner or owners in an action at law by the mayor, aldermen, and commonalty of said city."

This section, in connection with sec. 27 of the charter of 1857, [See Laws, ch. 446, p. 883], which provides for "an executive department of the city government known as the

city inspector's department, the chief officer of which shall be the city inspector, and shall have cognizance of all matters affecting the public health, pursuant to the ordinances of the common council, and the careful requirements of the Commissioners of Health and the Board of Health ;"—it is contended vested in the Board ample authority to direct the employment of Woodruff in the manner here shown ; and charged upon the defendants the responsibility of providing for the payment of all the expense arising from such employment.

Having now seen the general nature of the powers conferred by statute upon the Board, before commenting upon its extent let us turn to the state of affairs shown by the preamble to this resolution, directing the contract in question. From that it appears that in midsummer of 1859, the city corporation, with ordinances in force prohibiting throwing the contents of privies in the North or East River below 42d street, [see ordinances revd. 1859, p. 319, 320], and requiring all such filth to be cast into vessels at the end of certain piers, under a penalty of $50 for each offence, had no vessels provided by which the daily accumulations of filth in this large city might be removed beyond its limits. It may also be presumed that under these circumstances the city inspector had declined to permit the contents of any privy or sink to be removed, because he was unable to specify in the permission the pier to which the same might be taken and deposited, [see Ordinances 1859, p. 321, sec. 16], and thus it was that the health wardens had reported to him and the Board, [see Laws 1850, p. 607, sec. 1, sub. 1 and 2], the existence of over one thousand full sinks and privies without any provision made by the defendants for removing their contents from the usual dumping wharves in boats in the ordinary manner beyond the limits of the city or harbor. The addition to the preamble that such a nuisance was intolerable, seems to me obvious to more senses than one ; and if it were competent for us in any case to inquire whether a nuisance in fact existed after the Board of Health had declared that it did exist, there certainly is enough here shown to justify us in concurring in the conclusion at the time arrived at. But it has long been settled that courts have no such power in collateral proceedings like this to inquire whether the facts upon which

a board of health determines a thing to be a nuisance justify its conclusion. *Van Wormer* v. *The Mayor, &c., of Albany*, 15 Wend. 262.

We therefore must assume in the case before us that a serious nuisance, prejudicial to the health of the city, actually existed on the 11th day of June, 1858, and it remains for us to again refer to the statutes already cited to ascertain whether their provisions are sufficiently broad and comprehensive to include within them the power here shown to have been exercised.

The language of section 6 of the act of 1850 [*supra*] in its applicability to the case in hand may be stated thus : " The Board, when they shall judge it necessary, may cause any matter or thing within the city that may be dangerous to the public health to be removed to such place as it shall direct. The expense of such removal when so ordered may be recovered from the owner of the thing in an action at law by the mayor, aldermen and commonalty of the city."

There can be no question that here was a thing which they very properly judged necessary to have at all times removed from beyond the limits of the city or the harbor, as its presence was dangerous to the public health. It was a plain case, therefore, for the exercise of the power which the statutes confer upon the Board, and their contract was valid and binding upon the defendants, unless it be open to the objection that it was a continuing contract, covering a greater period of time than the necessities of the case called for, and therefore void.

But an obvious answer to this objection is, that it appears, by referring to the provisions of the agreement, that it was carefully guarded against a continuance one moment longer than the public necessity which called it into existence required, the engagement being only " to remove *temporarily*, or until further ordered by this Board or the Common Council." So that it was competent for the defendants or the Board of Health to terminate it at any moment. It was, therefore, clearly not a continuing contract in any objectionable sense. It did not in the slightest degree invade the powers of the Common Council of the city, or interfere in any way with their right to direct a contract to be entered into for the performance

of the same work in the manner prescribed by the charter. Or even without any such direction, they had but to order Woodruff to cease work under the contract, and his employment was at an end.

May it then be justly said that any danger can happen from the exercise of a power of this kind, and in this careful manner, by the Board of Health ? I am aware it was argued by the learned assistant corporation counsel that if such a power exists, it may be extended to cleaning the streets of the city, filling sunken lots, removal of garbage, etc. as to all of which the Board of Health might contract so as to invade the general powers conferred by the charter upon the mayor, aldermen and councilmen, but even admitting that it should be so extended, I have failed to perceive that any evil consequences would flow from thus holding, or that considerations of public policy forbid it. If it should occur that the Common Council, or any board of department, should fail to provide by contract against such a public necessity as this case shows, I would be very sorry to believe that the Board of Health could not provide temporarily for the emergency as was here done, reserving to the Common Council the right to terminate the arrangement made at any moment it should see fit.

Such an act would not be an interference with the powers conferred upon the Common Council, but, on the contrary, would be and should be regarded as an aid to those persons, to be called out when an emergency should arise demanding immediate action to protect the public from an impending danger.

A remaining objection is that the contract was made in violation of sec. 38 of the charter of 1857, which requires all such contracts involving an expenditure of over $250 to be founded upon sealed bids and proposals. But on reading that section it will be seen that its provisions apply only to contracts to be let by authority of the *Common Council*, and besides it seems quite clear for obvious reasons that this prohibition was never intended to apply to the Board of Health, a body the very object of whose organization was to provide speedy means of remedying those threatened evils to the public health which the fore thought and wisdom of the Common Council might be insuffi-

cient to guard against by the usual course of proceeding by contract or otherwise.

Upon the whole case, I think it is right that we should hold the present contract to be within the power of the Board of Health to enter into ; and that it was not in any sense a continuing contract, or to be regarded as an invasion of the powers conferred upon the Common Council, inasmuch as it reserved to that body the power to cancel it at any moment.

The judgment should be reversed and new trial ordered, costs to abide event.

BRADY, J. concurred.

DALY, F. J. [*dissenting*].—I still remain of the opinion that the Board of Health had no power to authorize the City Inspector to employ Woodruff to remove the contents of all the privies in the city of New York. I have no doubt of their power to order any act to be done, essential for the preservation of the health of the city, and where a public emergency demands it, to direct a contract to be made at once, without waiting for the authority of the Common Council, or for the making of a contract by the heads of departments, in the mode prescribed by statute. The general power conferred upon them is in these words : " When they shall judge it necessary, they may cause any matter or thing within the city, that may be putrid or otherwise dangerous to the public health, to be destroyed or removed." [Laws of 1850, p. 609.] It rests with them alone to judge of the necessity, but it must appear from their action, or from what they directed to be done, that they adjudged that the matter or thing directed to be removed was putrid or otherwise dangerous to the public health. This does not follow from the preamble and resolution which they adopted. The preamble declares that, whereas, the City Inspector has reported at his office over one thousand sinks and privies full, and no provision being made by the Common Council for the carrying away of their contents, and the nuisance has become intolerable, therefore, resolved. Now, the nuisance set forth in this preamble is the fact that over one thousand sinks and privies in the city were full ; and if their resolution had directed that the contents of these privies should

McLaren v. The Mayor &c. of New York.

be removed, it would be inferred in consonance with the preamble, that they had adjudged that their continuance in that state would be prejudicial to the public health, and that they had ordered their contents to be removed as a matter of public necessity. But their resolution went far beyond this. It empowered the City Inspector to employ Woodruff to remove, temporarily, or until further ordered by them or by the Common Council, all the contents of sinks and privies in the city. It contemplated that this was to be done unless they or the Common Council ordered otherwise. It did not direct the emptying of the thousand or more that were full, but the removal of the contents of all, whether full or not—a task that required and actually took more than a year to accomplish. Their preamble certainly did not indicate that they considered this essential for the preservation of the public health, nor could it be deemed so, unless suffering anything to remain in a privy could be regarded as having that effect. A work so extensive as this, involving the expenditure of a very large sum of money, and which required more than a year to perform, was one to be entered into under the authority of the Common Council, and to be put up to public competition in the mode provided by statute. I am disposed to give a broad and liberal construction to the power of the Board of Health, but I think it would be exceeding all just bounds to recognize their authority to make such a contract as this. It is true that the resolution declares that the City Inspector is to employ Woodruff to remove, temporarily, all the contents of the sinks and privies in the city, or until further ordered by the Board of Health or the Common Council, but it is precisely in this way that the provisions of the statute are defeated which require all contracts made under the authority of the Common Council for work to be done to be put up to public competition, if it involves an expenditure of more than $250, and I cannot regard as a legitimate exercise of the power of the Board of Health the empowering of work to be done not embraced in the nuisance set forth in their preamble, and which it is very manifest was not demanded upon any ground of pressing public necessity.

Judgment reversed, and new trial ordered.